IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-00918-MSK-MEH

JAIME SULLIVAN,

      Plaintiff,

v.

LIMITED BRANDS, INC. LONG-TERM DISABILITY PROGRAM (THE PLAN), and
LIMITED BRANDS, INC. ASSOCIATE BENEFITS COMMITTEE
    (THE PLAN ADMINISTRATOR),

      Defendants.

---

## ORDER AFFIRMING PLAN ADMINISTRATOR'S DECISION

---

**THIS MATTER**[1] comes before the Court pursuant to the Plaintiff's Motion for Summary

Judgment (**# 29**), the Defendants' response (**# 37**), and the Plaintiff's reply (**# 38**); and the

Defendants' Motion for Judgment on the Adminstrative Record (**# 31**), the Plaintiff's response (**#

41**), and the Defendants' reply (**# 43**).

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§ 1001, *et seq.* ("ERISA").  Plaintiff Jaime Sullivan claims that Defendants Limited Brands, Inc.

Long-Term Disability Program (the "Plan") and Limited Brands, Inc. Associate Benefits

Committee (the "Plan Administrator") violated ERISA by denying her claim for long-term

disability benefits.  Ms. Sullivan seeks an order from this Court awarding her past benefits, plus

---

[1]This case was originally assigned to the Hon. Phillip S. Figa, and briefed according to his
practice standards.  Upon Judge Figa's passing, the case was reassigned to the undersigned on
January 8, 2008.

interest from the date of denial, as well as future benefits, costs, and attorney's fees. Defendants urge the Court to affirm the decision on benefits and to dismiss plaintiff's claim.

## I.   PROCEDURAL HISTORY

Ms. Sullivan filed her Complaint (# 1) on May 16, 2006, bringing one claim for relief under ERISA for wrongful denial of benefits, 29 U.S.C. § 1132(a)(1)(B). The Plan and the Plan Administrator filed an Answer (# 14) on July 17, 2006. Defendants filed the Administrative Record (# 25) with the Court on October 6, 2006. The Administrative Record, which includes the materials that were before the Administrator at the time of its claim determination, will be referred to by the Court by page number and the designation "AR." The Plaintiff and the Defendants both filed a dispositive motion with accompanying briefs on January 8, 2007; the Plaintiff filed a Motion for Summary Judgment (# 29), and the Defendants filed a Motion for Judgment on the Administrative Record (# 31).[2]   Both motions have been fully briefed.

---

[2]The use of both of these procedural tools to obtain review of an ERISA plan adminstrator's decision has been deprecated. *See Jewell v. Life Ins. Co. of North America*, 508 F.3d 1303, 1307 n. 1 (10th Cir. 2007) ("The Federal Rules of Civil Procedure contemplate no such mechanism as 'judgment on the Administrative Record.' Parties should avoid the practice of requesting it, and courts should avoid purporting to grant it.") (citation omitted); *Panther v. Synthes (USA)*, 380 F.Supp.2d 1198, 1207 n. 9 ("Although defendant brings this motion pursuant to Fed.R.Civ.P. 56(c), the court does not examine defendant's motion under the traditional summary judgment standard. . . . [T]he summary judgment standard is not the proper standard when evaluating a denial of ERISA benefits under arbitrary and capricious review. Instead, the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the Administrative Record.") (citations omitted). Without disparaging *Jewell*'s notion that such matters will most commonly be resolved via "a bench trial on the papers," 508 F.3d at 1307 n. 9, *citing Hall v. UNUM Life Ins. Co. of America*, 300 F.3d 1197, 1200 (10th Cir. 2002) *and Muller v. First Unum Life INs. Co.*, 341 F.3d 119, 124 (2d Cir. 2003), this Court finds that *Panther*'s notion of this Court sitting in an appellate capacity most closely fits the facts of this case, where the parties have not disputed the completeness of the Administrative Record. Accordingly, this Court treats the case as presenting cross-appeals under Fed. R. App. P. 28.1, and finds that argument as to facts and law are sufficiently presented that the case can be resolved on the papers, such that oral argument is not

## II.    FACTUAL BACKGROUND

### A.    The Plan

Beginning in May 2003, Ms. Sullivan was employed by Limited Brands, Inc. as a retail store manager. AR 3. On June 21, 2003, she enrolled in the Defendant Plan, an employee benefit plan subject to ERISA that provides long-term disability ("LTD") benefits to eligible employee-participants. Benefits are paid out of a trust fund that is funded by contributions from The Limited Service Corporation ("The Limited"), the Plan's sponsor. AR 736. MetLife, the Plan's claims administrator, reviews claims for benefits under the Plan and determines whether a participant is qualified to receive such benefits. AR 604. Upon denial of a claim, the participant may request that MetLife reconsider its determination. AR 596–97. If MetLife affirms its decision, the participant may request a final review of the decision by Defendnt Limited Brands, Inc. Associate Benefits Committee, the Plan Administrator. AR 597.

Under the Plan, a participant who is found to have a "Total Disability" qualifies for LTD benefits. A participant is "Totally Disabled" if he or she:

  (a)    is under the regular care of a Physician; and

  (b)    as a result of an Illness/Injury having an Onset Date while the Participant is a Participant:

    (i)    during the twelve (12) months immediately following the Benefit Commencement Date, the Participant is unable to perform any and every duty related to the Participant's regular occupation in which he or she was engaged immediately prior to the occurrence of the Illness/Injury; and

---

necessary, Fed. R. App. P. 34(a)(2)(C). *See generally Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (when District Court sits in an appellate capacity, the Federal Rules of Appellate Procedure apply).

  (ii)  thereafter, the Participant cannot work at any gainful occupation for which the Participant is reasonably qualified, or could become qualified, by education, experience or training.

AR 606.  The "Benefit Commencement Date" occurs 30 days after the date the participant ceases work due to the disability.  AR 604–05.  To establish entitlement to LTD benefits, the Plan requires participants to "submit a Physician's statement, satisfactory to the Claims Administrator, certifying that the Participant continues to be Totally Disabled and providing details concerning the Participant's Illness/Injury and Total Disability, including, but not limited to, the history of the Total Disability, diagnosis, treatment, and prognosis for recovery."  AR 608.

  B.  <u>Ms. Sullivan's Disability Claim</u>

  On July 10, 2004, Ms. Sullivan completed the employee portion of a claim for disability benefits, noting a date of "8/4/04" as the "date disability began."  AR 2.  Ms. Sullivan's treating physician, Dr. Jamie Houg, completed the attending physician portion of the form on July 13, 2004.  *Id.*  He listed a primary diagnosis of parvovirus and a secondary diagnosis of migraines, and noted that Ms. Sullivan had been referred to UCLA Medical Center for additional testing, medication, and possible hospitalization, and would be on "full leave 8/4/04 to unkn."  *Id.*  Ms. Sullivan continued working until August 4, 2004, which was the date of her first appointment at UCLA.  AR 282.

  Ms. Sullivan's claim was forwarded to MetLife, the claims administrator, which notified Ms. Sullivan on August 12, 2004 that it had approved short-term benefits from August 4, 2004 through September 3, 2004.[3]  AR 5.  MetLife also advised Ms. Sullivan to submit additional

---

[3] Ms. Sullivan's short-term benefits were subsequently extended through September 12, 2004.  AR 11.

medical information in support of her claim for benefits beyond that date, including recent office

notes and test results, current medications, functional abilities, and an expected return-to-work

date. AR 9, 11. In response to those requests, Ms. Sullivan submitted the following:

- A letter dated August 20, 2004 from Dr. Edwin Amos, a neurologist, to Dr. Peter Katona, a physician who was treating Ms. Sullivan at UCLA Medical Center. The letter describes Ms. Sullivan's history of episodic disabling headaches for the past year, along with unexplained fevers and night sweats, and notes her concern that she may have had episodes of loss of consciousness associated with the headaches. The letter also notes that the headaches have been occurring approximately twice a month with no progression or change. AR 9.

- A letter dated September 9, 2004 from Dr. Amos to Dr. Katona regarding Ms. Sullivan's follow-up appointment. The letter notes that the results of an MRI brain scan and an electroencephalogram were normal and that Ms. Sullivan had had no further episodes of loss of consciousness. She continued to have episodic disabling headaches, which Dr. Amos classified as migraines, as well as irregular sleep patterns. Dr. Amos stated he was prescribing her Topamax on a trial basis as a preventive agent for the migraines. AR 16.

- A Supplemental Attending Physician Statement completed by Dr. Katona, dated September 21, 2004, which listed a primary diagnosis of fever of unknown origin and a secondary diagnosis of migraine headaches. AR 20. Dr. Katona noted that Ms. Sullivan had the ability to sit, stand, and walk continuously (he did not indicate the number of hours she could do these things); she could climb, twist, bend, stoop, reach above shoulder level, and drive; she could repetitively perform fine finger movements, eye/hand movements, and pushing/pulling; and she could carry up to 20 pounds frequently. AR 21. Under the question, "Have you advised patient to return to work?" Dr. Katona checked the box for "No," stating, "headaches and fever interfere." *Id.*

Along with the information provided by Ms. Sullivan, MetLife also requested office notes,

objective testing, and any interpretive results thereof from Dr. Renee Rinaldi, a rheumatologist

who examined Ms. Sullivan in Los Angeles in October 2004. AR 29. Dr. Rinaldi provided office

notes and lab test results indicating as follows:

- In an office note dated October 18, 2004, Dr. Rinaldi noted that Ms. Sullivan was first seen in August 2003 with a rash on her legs and two small nodes under her left ear, that she was diagnosed with parvovirus, that she later developed severe migraines, and that she

also developed pain in her knees and ankles that improved with prednisone.  Dr. Rinaldi also diagnosed emerging rheumatoid arthritis.  AR 37.

- Ms. Sullivan's lab results indicate a positive rheumatoid factor of 22 on October 20, 2004 and 73 on November 3, 2004 (normal range is <20), as well as an abnormal sedimentation rate of 28 and 21 on those dates, respectively (normal range is 0–20).  AR 33–36.  These findings are apparently consistent with the diagnosis of emerging rheumatoid arthritis.

On November 30, 2004, MetLife informed plaintiff that her claim had been denied

effective September 12, 2004, stating:

> The medical records received from Dr. Rinaldi does not [sic] support an impairment that would preclude you from returning to work.  There was no treatment plan indicated, the provided test results were normal findings, there were no restrictions and limitations provided for review.  Therefore, benefits after September [1]2, 2004[4] are not payable and your claim is terminated.

AR 42.  Ms. Sullivan requested that MetLife reconsider its denial, AR 44, and submitted the

following new medical documentation:

- A chest x-ray, CT scan of the chest, and MRI of the brain dated August 10, 2004 were normal, and an electroencephalogram conducted on September 1, 2004 was also normal.  AR 59–61, 63, 75.  An MRI of the cervical spine dated August 10, 2004 revealed a 2 mm broad-based central protrusion at the C5–6 vertebrae that did not approach the cord or result in canal or foraminal stenosis.  AR 58.

- Dr. Rinaldi's office notes from a November 1, 2004 visit noted persistent polyarthralgia, fatigue, arm and hand stiffness with no synovitis (swelling), and likely emerging rheumatoid arthritis.  AR 90.

- Dr. Rinaldi's office notes from a November 12, 2004 visit noted Ms. Sullivan's fever had resolved since a cortisone shot and treatment with Mobic (an anti-inflamatory drug), her pain was a bit better, and her headaches had resolved on the Topomax, but she was experiencing some numbness in her feet since starting on that medication.  The notes also indicate a diagnosis of seropositive polyarthritis for the past 15 months.  AR 94–95.  Dr. Rinaldi conveyed similar information to Dr. Katona on November 18, 2004, noting mild synovitis of hands and diagnosing emerging rheumatoid arthritis.  AR 96.

---

[4] The letter actually states September 22, 2004, but that appears to be a typo.

- Dr. Rinaldi's office notes from a November 29, 2004 visit state that the hand swelling had decreased since Ms. Sullivan started on Methotrexate. AR 97.

As part of its review, MetLife referred Ms. Sullivan's claim to an onsite nurse consultant. AR 101. In a letter dated January 24, 2005, MetLife stated it had reviewed all of Ms. Sullivan's medical records, summarized the records, and upheld the denial of her claim, concluding in pertinent part:

> It was determined [by the consultant] that the medical records do not offer findings of a significant medical condition that would prevent you [Ms. Sullivan] from working as a Store Manager beyond September 3, 2004. The records indicate that you had a history of migraine headaches since at least August 2003. You noted that your headaches were occurring twice a month. Although you had complaints of headaches for the past year, you were capable of working throughout this year. It appears as though you ceased working on August 3, 2004 to travel to UCLA for additional testing as your physician and other specialists in your area could not determine etiology for your problems. It appears as though your absence from work was due to travel for a diagnostic work-up, and not due to disabling symptoms or medical conditions. The records indicate that you had experienced headaches and fevers for the past year and it is unknown why these complaints would suddenly prevent you from performing your job duties in August 2004. In addition, it appears as though your fevers were only occurring at night, which would not interfere with your ability to work as a Manager during the day shift. One physical examination noted mild synovitis of your hands. The other examinations were all normal. The medical records do not offer evidence of a medical condition that began on August 3, 2004 when you ceased working that would prevent you from being able to work as a Store Manager.

AR 106.

On February 9, 2005, Ms. Sullivan requested a review of her claim by the Plan Administrator. The Plan Administrator referred Ms. Sullivan's file to Dr. Leonard Sonne, a physician board-certified in Internal Medicine and Pulmonology, for an independent review. AR 121. Dr. Sonne concurred with the decision to deny benefits, concluding:

> The history and physical examination testing support a diagnosis of rheumatoid arthritis. Records indicate a diagnosis of episodic migraine headaches as well; she

7

was placed on Topamax for prevention. There are no objective findings of impairment. There are no limitations in ability to function related [to] Ms. Sullivan's condition. There are no restrictions due to safety conditions related to her job as a store manager.

AR 122. In response to the query of whether he agreed with the decision to deny LTD benefits, Dr. Sonne stated:

The reviewer [Dr. Sonne] agrees with the denial of disability benefits beyond . . . September 3, 2004. There are no objective findings of impairment. The diagnosis of rheumatoid arthritis appears to have emerged during that period of time. The treatment is NSAIDs [nonsteroidal anti-inflammatory drugs] and she was started on methotrexate, which helped. The extensive workup, CAT scans and MRIs were essentially negative. Again, Ms. Sullivan does have rheumatoid arthritis and is on effective treatment. There is no objective documentation to substantiate impairment restrictions or limitations beyond September 3, 2004 for either R.A. or headache.

AR 122–23. Based on Dr. Sonne's opinion, the Plan Administrator affirmed the decision to deny Ms. Sullivan's claim on March 30, 2005. AR 126.

On April 11, 2005, Ms. Sullivan, through her attorney, requested that she be permitted a further administrative appeal of the denial of benefits, stating that her attorneys had been preparing the appeal since February 2005 and had had trouble obtaining all relevant documents from MetLife. AR 128. On June 14, 2005, the Plan Administrator agreed to allow Ms. Sullivan "to repeat her final administrative appeal." AR 138. Ms. Sullivan submitted her formal appeal letter, with accompanying additional medical records and several personal statements from Ms. Sullivan and her family and friends, on July 25, 2005. AR 172.

In her personal statement, AR 196, Ms. Sullivan described the physical requirements of her job as a store manager, which are relevant because the existence of a "Total Disability" is based on Ms. Sullivan's inability to perform "any and every duty" related to her occupation on the

date of onset of the disability. She stated her job had a high stress level due to corporate expectations for the store she managed and that she was regularly required to: move constantly from associate to associate as floor supervisor; use fingers and hands for extended periods; lift and carry bulky items weighing from zero to thirty pounds; climb up and down ladders; stand in place leaning while using hands for extended periods; sit for periods of a half-hour to an hour-and-a-half; and perform repetitive movements using hands. AR 196–97. She stated she was dealing with excruciating pain during the course of her employment; she has been on a series of medications that have numerous side effects; she began experiencing depression for which she also takes medication with side effects; and her essential job duties "became impossible to perform" due to her pain and limitations. AR 199.

The personal statements of Ms. Sullivan's family, friends, and coworkers provide general descriptions of Ms. Sullivan's deteriorating health, AR 242, 249, praise her work ethic and dedication to her job, AR 246, and describe the stressful nature of her job as her health deteriorated. AR 252.

The medical records submitted with Ms. Sullivan's appeal include the following records from both before and after the alleged onset date of her disability:

- Office notes from Dr. Houg indicating Ms. Sullivan had complaints of fatigue, joint pain, and depression as early as May 2003, a diagnosis of fibromyalgia in June 2003, and ER visits for headaches as early as August 2003. AR 290–94.

- Office notes from two visits to Dr. Robert Spencer, a rheumatologist, in March 2004, at which time Ms. Sullivan was complaining of joint pain in her back, hips, elbows, wrists, ankles, knees, and occasionally her hands, as well as severe fatigue. AR 259. Dr. Spencer noted the history of parvovirus and intermittent migraines, and ineffective treatment with NSAIDs and low-dose prednisone. He also diagnosed diffuse myofascial pain syndrome rather than an inflammatory rheumatic condition. AR 260. (As discussed above, Ms. Sullivan was in fact later diagnosed with emerging rheumatoid arthritis.) Dr. Spencer

described all joints as having full range of motion with no detectable synovitis and noted ongoing moderately severe tenderness with palpation of typical FMS trigger point areas. AR 262.

- Office notes from visits to Dr. Stephen Eppler, a rheumatologist, on January 25 and February 15, 2005. The January note describes Ms. Sullivan's history of insomnia, severe migraines, and persistent arthralgias with severe knee pain. AR 407. Dr. Eppler also notes that the headaches had improved with Topamax, that she had complaints of significant bilateral knee pain and continued problems with her hands, shoulders, hips, and occasionally her ankles, and that tender points were present in a distribution consistent with fibromyalgia. The February note states that Ms. Sullivan complained of continued pain in most of her joints, but that she felt better on Prednisone, and his assessment included seropositive rheumatoid arthritis, persistent fibromyalgia, history of parvovirus—fully resolved, flexor tendinitis, sleep disturbance, and depression/anxiety. AR 404–05.

- Assessments of Dr. Eric Westerman, a rheumatologist who examined Ms. Sullivan in March and April 2005. In a letter to Dr. Houg dated March 29, 2005, Dr. Westerman notes that Ms. Sullivan stated that the prednisone helped her joint pain but caused other problems and that she had classic fibromyalgia trigger points but no synovitis, and his assessment included seropositive rheumatoid arthritis refractory to a steroid taper and fibromyalgia. AR 264–65. He stated that he would stop her methotrexate, start her on Remicade, and attempt to taper her off the steroids. Ms. Sullivan received her first Remicade infusion on April 11, 2005, when Dr. Westerman noted that she was basically feeling fair, but was still on steroids at 10 mg. AR 274.

- Office notes of Dr. Kamasamudram Ravilochan, who saw Ms. Sullivan on March 15, 2005 and prescribed Topamax and Midrin. AR 329.

- Office notes of Dr. Craig Rose, a psychologist who apparently began treating Ms. Sullivan for depression in February 2005. AR 473.

After Ms. Sullivan submitted her appeal, the Plan Administrator referred her file to Dr. Patricia Fraser, a physician board-certified in Internal Medicine and Rheumatology, for a second independent review. On September 13, 2005, Dr. Fraser opined that Ms. Sullivan was unable to perform the duties of her job, concluding:

> Based on the most recent physical findings, Ms. Sullivan would be impaired in performing all the tasks she describes in her job description. She was just started on Remicade. This medication may result in substantial improvement in arthritis

and function.  Functional capacity should be reassessed after 6 months of
Remicade treatment.

AR 495.  The Plan Administrator then requested that Dr. Fraser assess Ms. Sullivan's condition as

of September 2004, when disability benefits were denied.  AR 507.  Dr. Fraser responded that her

opinion had not changed, concluding:

> My previous conclusions have not changed.  I have reviewed the additional
> information on Ms. Jaime Sullivan, a 28 year old retail clothing store sales
> manager.  Rheumatology consultation by Dr. Rinaldi on 11/12/04 included a 15
> month history of seropositive polyarthritis.  Physical exam on that date
> demonstrated . . . symmetrical PIP synovitis.
>    . . . .
>
> Based on the history of chronic polyarthritis, Ms. Sullivan would be impaired in
> performing . . . all tasks she describes in her job description in September 2004.

AR 511–12.

The Plan Administrator also requested that Dr. Sonne re-review Ms. Sullivan's file with

the new information submitted on appeal.  AR 500.  Dr. Sonne summarized the new

documentation and stated that it did not change his opinion, noting:

> What is not documented is objective documentation of any restriction, limitation,
> or impairment that would preclude performing Ms. Sullivan's fulltime job; that is
> missing from the chart.  There is no change from the previous review.  There is no
> objective documentation of any functional limitation, impairment, or restriction.

AR 515.

On November 14, 2005, the Plan Administrator issued its final determination of Ms.

Sullivan's claim and upheld the denial of LTD benefits.  AR 521.  The Plan Administrator

essentially stated that it found Dr. Sonne's opinion more convincing than Dr. Fraser's, noting:

> Dr. Fraser's conclusion that your 15-month history of chronic polyarthritis as of
> October 2004 is evidence of Total Disability is contrary to the fact that you were
> able to work as a store manager for at least 13 of those 15 months (up until

August 2004). Dr. Fraser's opinion appears to be based on your current diagnosis and self-reported symptoms, not on your ability to work as of September 2004. Dr. Sonne's opinion that you did not qualify for Total Disability based on his review of the file better reconciles with the fact that you were able to work for at least 13 months of the 15-month history of chronic polyarthritis noted by Dr. Fraser.

AR 522. The Plan Administrator also concluded that the documentation indicated Ms. Sullivan "left work not due to a Total Disability, but rather to participate in a previously planned case study at UCLA." *Id.* The Plan Administrator further referenced Dr. Amos's notes regarding the effectiveness of the Topamax on Ms. Sullivan's migraines and Dr. Sonne's opinion that there was no objective documentation to substantiate impairment restrictions or limitations for either rheumatoid arthritis or headaches. AR 523. Finally, the Plan Administrator found Ms. Sullivan's personal statement and the testimonials of her friends and family to provide "little subjective evidence" of Ms. Sullivan's condition as of September 2004, concluding that they generally related to her present condition and not to her condition when she applied for benefits. *Id.*

## III.    STANDARD OF REVIEW

The parties agree that the ERISA Plan at issue gives the Plan Administrator discretionary authority to determine eligibility for benefits. As such, the Court applies an "arbitrary and capricious" standard of review, and "the decision will be upheld so long as it is predicated on a reasoned basis." *Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006), *citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113–15 (1989), and *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)).

However, when a plan administrator is operating under a conflict of interest, a less deferential standard of review is warranted. *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d

997, 1003 (10th Cir. 2004), *cert. denied*, 544 U.S. 1026 (2005). In applying this standard, the Tenth Circuit has adopted a "sliding scale" approach, in which the court applies the arbitrary and capricious standard, but "decrease[s] the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Id.* at 1004. In *Fought*, the Tenth Circuit expounded on this sliding scale approach. The court first discussed the effect of a "standard" conflict of interest, which exists when "a fiduciary plays more than one role pursuant to ERISA." *Id.* at 1005. Unless the plaintiff can establish the existence of a "serious conflict of interest," the standard conflict will simply be viewed "as one factor" in determining whether the denial of benefits was arbitrary and capricious. *Id.* However, an additional reduction in deference is appropriate when the administrator operates under either an inherent or proven conflict of interest, or when a serious procedural irregularity exists. *Id.* at 1006. In such situations, the plan administrator must show that its interpretation of the Plan's terms and its application of those terms to the facts at hand is supported by substantial evidence, and the court "must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned [one], untainted by the conflict of interest." *Id.*

Ms. Sullivan first argues there is a proven conflict of interest in this case, such that the burden should be on the Plan Administrator to show its decision was supported by substantial evidence. In evaluating whether a serious conflict of interest has been proven, courts consider several factors including whether:

> (1) the plan is self-funded, (2) the company funding the plan appointed and compensated the plan administrator, (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits, and (4) the provision of benefits had a significant economic impact on the company administering the plan.

*Id.* In this case, the Plan is self-funded, at least in the sense that benefits are paid out of a trust

funded by contributions from The Limited, the Plan's sponsor. AR 541, 736. In addition,

defendants concede that the members of the benefits committee, which operates as the Plan

Administrator, are appointed by The Limited. However, the evidence affirmatively shows that the

committee members' compensation was *not* linked to decisions regarding benefits, and plaintiff

has presented no evidence that such decisions are linked to performance reviews. AR 594 (Plan

states that committee members "shall not receive any special compensation for serving in such

capacity but shall be reimbursed for any reasonable expenses incurred in connection therewith").

Moreover, although the Plan is self-funded, there is no evidence that the provision of benefits

would have a significant economic impact on The Limited, particularly given the Plan expressly

provides an exclusive remedy for participants. AR 603. Thus, The Limited "incurs no direct

expense as a result of the allowance of benefits, nor does it benefit directly from the denial or

discontinuation of benefits." *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997). For the

foregoing reasons, the Court finds that Ms. Sullivan has not shown that a conflict of interest

jeopardized the Plan Administrator's impartiality.[5] *Fought*, 379 F.3d at 1005.

Ms. Sullivan also contends that a reduction in deference is warranted because the Plan

Administrator operated under an inherent conflict of interest. Tenth Circuit law on what

constitutes such an "inherent" conflict of interest is not entirely clear. In *Fought*, the Tenth

Circuit indicated that an inherent conflict automatically exists when the administrator serves "as

both insurer and administrator of the plan" because of the conflict of interest "between its

---

[5]Even assuming that Ms. Sullivan is correct, and the Court should apply the heightened
"substantial evidence" standard, the Court would nevertheless have reached the same result for
essentially the same reasons as stated herein.

discretion in paying claims and its need to stay financially sound." *Id.* (citing *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1296 (10th Cir. 2000) (quotation marks omitted)). However, in a subsequent decision the Tenth Circuit declined to recognize such a broad holding, noting that an administrator's dual role as administrator and insurer "does not on its own warrant a further reduction in deference." *Adamson*, 455 F.3d at 1213. Thus, even evaluating whether an inherent conflict of interest exists requires an examination of the particular facts of the case. *Id.* (noting that statements in *Fought* and other decisions "were never meant to be an *ipso facto* conclusive presumption to be applied without regard to the facts of the case").

In any event, the Court finds that an inherent conflict of interest does not exist in this case. The reason for concern when an insurer doubles as a plan administrator is that, when the administrator grants a claim, benefits are paid out of the insurer's own assets, directly affecting the insurer's ability "'to stay financially sound.'" *Adamson*, 455 F.3d at 1213, *quoting Pitman*, 217 F.3d at 1296 n.4. In the instant case, as discussed above, benefits are paid solely out of the assets of a trust, not out of The Limited's own assets. Although The Limited is indirectly affected by payment of claims – in that it must make additional contributions to the trust – the lack of a direct connection between the granting or denial of benefits and The Limited's financial viability differentiate this case from those in which a single entity serves as insurer and administrator. *See Buckley*, 115 F.3d at 939; *see also Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 n.4 (3d Cir. 1997) (finding no conflict of interest existed when the plan at issue was self-funded and the plan assets were distributed by a trustee).

Finally, Ms. Sullivan argues that there was a serious procedural irregularity with respect to the Plan Administrator's denial of benefits warranting heightened scrutiny. In *Fought*, the Tenth

Circuit found that such an irregularity existed when an administrator denied benefits "in a complicated set of circumstances without seeking any independent review." *Fought*, 379 F.3d at 1007. Relying on that language, Ms. Sullivan contends that "[t]he Plan Administrator's denial of benefits to Plaintiff in the face of two medical reviews at polar ends of the scale [Dr. Sonne's and Dr. Fraser's] without seeking additional information in the form of an independent medical review readily available under the terms of the plan constitutes a serious procedural irregularity." The Court disagrees for several reasons. First, Ms. Sullivan points to no specified procedure that calls for a third opinion in these circumstances. One can hardly find a procedural "irregularity" where no established procedure exists.

Second, the Court observes that the Administrative Record is substantial, containing what appears to be most, if not all, of the medical records documenting Ms. Sullivan's diagnoses and treatment by several doctors over more than two years. Ms. Sullivan's file was reviewed twice by two independent physicians for opinions regarding the existence of a Total Disability as defined in the Plan. A third evaluation might arguably "break the tie" between Dr. Sonne and Dr. Fraser, but the Plan Administrator's decision is not one to be made simply by majority rule. The Plan Administrator must necessarily <u>qualitatively</u> assess each doctor's opinion in light of the entire record, and in this sense, the addition of a third opinion would not necessarily yield a more reliable or reasonable result. Accordingly, the Court finds that the failure to obtain a third opinion does not constitute a serious procedural irregularity.

Thus, the Court finds that only a "standard conflict" exists under *Fought*, and simply considers the conflict as one factor in determining whether the Plan Administrator's denial of benefits was arbitrary and capricious. In applying this standard, the Court's review is "confined to

the Administrative Record," which includes the evidence before the Plan Administrator at the time the decision to deny benefits was made. *Adamson*, 455 F.3d at 1212, 1214.

## IV. ANALYSIS

In upholding the denial of Ms. Sullivan's claim for LTD benefits, the Plan Administrator determined that Ms. Sullivan did not have a Total Disability as defined in the Plan. As defined by the Plan, Ms. Sullivan has a "Total Disability" if she is under the regular care of a physician and, as a result of an illness "is unable to perform any and every duty" related to her occupation as a store manager "during the twelve (12) months immediately following the Benefit Commencement Date," which in this case is September 4, 2004. AR 604, 606.

### A. Selective Review of Records

Ms. Sullivan asserts that the Plan Administrator "blatantly ignored its fiduciary duty" by endorsing MetLife's review of her claim as a "full and fair review," when in reality MetLife's decision was allegedly "made by relying on fragments of Plaintiff's medical records." Ms. Sullivan asserts that the medical records include assessments of seropositive rheumatoid arthritis, fibromyalgia, episodic disabling headaches, history of parvovirus, and depression/anxiety, which are supported by blood test results showing elevated sed rates, rheumatoid factor, and c-reactive protein. She contends MetLife minimized these findings and ignored the findings of the MRI on her cervical spine showing a 2 mm broad-based central protrusion at the C5–6 vertebrae. She also contends MetLife ignored Dr. Houg's statement in her original claim that he was placing her on "full leave 8/4/04 to unkn." due to her referral to the UCLA Medical Center. Finally, she complains of the Plan Administrator's denial of benefits "in the face of two medical reviews at the polar ends of the scale."

It does not appear, however, that either MetLife or the Plan Administrator disputes the diagnoses contained in Ms. Sullivan's medical records or whether there was objective support for those diagnoses. In its January 24, 2005 letter upholding the denial of Ms. Sullivan's claim, MetLife recognized the normal as well as the abnormal lab results, noted the existence of Ms. Sullivan's migraines that were apparently being effectively treated with Topamax, and noted the diagnoses of emerging rheumatoid arthritis and polyarthritis. The mere fact that Ms. Sullivan was so diagnosed, however, does not bear on the issue of whether, under the terms of the Plan, those conditions rendered her unable to perform her duties as a store manager as of August 3, 2004, the date she ceased working due to those conditions.

Upon its initial review of MetLife's denial of benefits, the Plan Administrator relied largely on Dr. Sonne's opinion. Dr. Sonne's conclusions again were not based on any disagreement with respect to Ms. Sullivan's diagnoses, but on the lack of objective support in her records for any functional limitations related to her job duties. Dr. Sonne expressly took into account the results of her MRI and other radiologic examinations, along with the office notes from her treating physicians and the associated blood work. AR 121–22. Upon further review of additional evidence provided by Ms. Sullivan, which he described in detail, Dr. Sonne did not change his conclusions. AR 514–15. The Plan Administrator's reliance on Dr. Sonne's opinion letters, which contained an extensive description and analysis of the medical record and the basis for his conclusion, was reasonable. Indeed, Dr. Sonne is correct that few, if any, of the various office notes, test results, and diagnoses discuss the Plaintiff's ability to perform the particular tasks of her position in any degree of detail. Because the definition of "Totally Disabled" turns on <u>both</u> the existence of an illness <u>and</u> substantial functional limitations arising from that illness, the failure

of the record to reveal the existence of the latter adequately supports both Dr. Sonne's conclusions, as well as those of the Plan Adminstrator.

With regard to Ms. Sullivan's referral to UCLA Medical Center in August 2003, the Plan Administrator explained in detail why it found this fact unpersuasive, noting that the record indicated the trip to UCLA had been planned in advance, that the purpose of the referral was to obtain a diagnostic workup, and that Ms. Sullivan continued to work until shortly before she left for UCLA. AR 522–23. The record also supports the conclusion that Dr. Houg's placement of Ms. Sullivan on "full leave 8/4/04 to unkn," although related to her medical condition, was not because her condition had rendered her unable to perform her job duties as of that date.

Finally, the Plan Administrator's decision to follow Dr. Sonne's rather than Dr. Fraser's report was not arbitrary. Once again, the Plan Administrator is required to <u>qualitatively</u> evaluate the evidence in the record. It was reasonable for the Plan Administrator to observe that Dr. Fraser's opinion that Ms. Sullivan was "Totally Disabled" under the Plan as of September 2004 was not explained in detail and was apparently based on Ms. Sullivan's 15-month history of seropositive polyarthritis, as documented in a November 12, 2004 note from Dr. Rinaldi. AR 511–12. As noted by the Plan Administrator in its final denial letter, however, Ms. Sullivan had worked for 13 of those 15 months, and it is unclear from Dr. Fraser's opinion how Ms. Sullivan's condition had progressed such that it rendered Ms. Sullivan "Totally Disabled" during the relevant time period. The Plan Administrator's conclusion that Dr. Sonne's opinion was more consistent with the evidence in the Administrative Record was a reasonable one and thus was not arbitrary and capricious.

B.    <u>Failure to Obtain Independent Medical Examination</u>

Ms. Sullivan asserts that, because Dr. Sonne and Dr. Fraser reached opposite conclusions regarding her entitlement to benefits, the Plan Administrator should have requested that an independent physician examine Ms. Sullivan "to confirm which of the two opinions was correct." Just as the failure to obtain a third opinion did not constitute a serious procedural irregularity, however, it also does not render the Plan Administrator's decision arbitrary and capricious. First, it is unclear whether a physical examination of Ms. Sullivan in October 2005—which is when Drs. Sonne and Fraser issued their supplemental opinions—would have aided a determination of whether she was Totally Disabled as of September 2004. Moreover, as noted above, the Administrative Record is extensive and has been reviewed by three medical professionals, two of whom were independent physicians. While the Plan Administrator could have chosen to obtain another opinion or to have relied on Dr. Fraser's, its decision to rely on Dr. Sonne's was reasonable and supported by the record.

## VI.    CONCLUSION

For the foregoing reasons, the Court holds that the Plan Administrator's decision was reasonable and that its denial of benefits was not arbitrary and capricious. Accordingly, having treated the parties' motions as briefing pursuant to Fed. R. App. P. 32, and having considered the matter in an appellate capacity, under the standards discussed above, the Court **AFFIRMS** the decision of the Plan Adminstrator. Contemporaneously with this Opinion, the Court will enter judgment in favor of the Defendants.

Dated this 5th day of March, 2008

**BY THE COURT:**

Marcia S. Krieger
United States District Judge